```
              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF ALABAMA
                       SOUTHERN DIVISION

SUSAN S. DePAOLA, Chapter 7    )
Bankruptcy Trustee for         )
Collins Signs, Inc.,           )
                               )
              Plaintiff,        )              1:04CV267
                               )
         v.                    )
                               )
NISSAN NORTH AMERICA, INC.;    )         MEMORANDUM AND ORDER
MARK PERRY; PETER BOSSIS;      )
ERIC SMITH; DEAN HORTON;       )
NISSAN MOTOR ACCEPTANCE        )
CORPORATION; MARK DOI;         )
CATHY WAKISAKA; TURNER &       )
TOWNSEND GROUP; TURNER &       )
TOWNSEND (USA), LTD.;          )
MATTHEW CRYER; KEN-MAC METALS,)
INC.; LARRY PARSONS; DENISE    )
LONG; IMAGEPOINT, INC.,, f/k/a)
Plasti-Line; JAMES R. MARTIN;  )
TED CHRISTIANSON; BRAK ALFORD  )
KAYLE MOYE; AUDI LESTER;       )
BUNKER PLASTICS; JOHN          )
PARKINSON,                     )
                               )
              Defendants.       )
_____)
```

This matter is before the Court on the motions to
dismiss the second amended complaint filed by defendants Nissan
North America, Inc. ("NNA"), Mark Perry ("Perry"), Peter Bossis
("Bossis"), Eric Smith ("Smith") and Dean Horton ("Horton")
(collectively with NNA, the "NNA Defendants"); Nissan Motor
Acceptance Corporation ("NMAC"), Mark Doi ("Doi") and Cathy
Wakisaka ("Wakisaka") (collectively with NMAC, the "NMAC
Defendants")(Filing No. 156); Turner & Townsend Group ("T&T
Group"), Turner & Townsend (USA) Ltd. ("T&T USA") and Matthew

Cryer ("Cryer")(collectively "T&T Defendants")(Filing No. 166);
Ken-Mac Metals, Inc. ("Ken-Mac"), Larry Parsons ("Parsons")and
Denise Long ("Long") (collectively "Ken-Mac Defendants")(Filing
No. 172); ImagePoint, Inc., f/k/a Plasti-Line, Inc. ("Image
Point"), James R. Martin ("Martin"), Ted Christianson
("Christianson"), Brak Alford ("Alford"), Kayle Moye ("Moye") and
Audi Lester ("Lester") (collectively "Image Point
Defendants")(Filing No. 164); and Bunker Plastics, Inc.
("Bunker") and John Parkinson ("Parkinson") (collectively with
Bunker "Bunker Defendants")(Filing No. 161) under Federal Rules
of Civil Procedure 12(b)(1) and 12(b)(6).  Plaintiff Susan S.
DePoala, Chapter 7 Bankruptcy Trustee for Collins Signs, Inc.
("Trustee" or "plaintiff") filed a response to the motions
(Filing No. 177).  The Court has reviewed the motions, the briefs
in support and opposition, the pleadings and the applicable law
and makes the following findings.

## I.  MOTION TO DISMISS STANDARD

For the purpose of a 12(b)(6) motion to dismiss for
failure to state a claim upon which relief can be granted, the
complaint must be construed in the light most favorable to the
plaintiff, and all facts as alleged by the plaintiff must be
accepted as true.  *SEC v. Dunlap*, 2002 U.S. Dist. LEXIS 10769, at
*3-7 (S.D. Fla. 2002)(*citing Hishon v. King & Spaulding*, 467 U.S.
69, 73(1984); *Brooks v. Blue Cross & Blue Shield of Florida*, 116

F.3d 1364, 1369 (11th Cir. 1997) (per curiam).  It is a well-settled principle that the complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  In sum, motions to dismiss are "viewed with disfavor and rarely granted." *Brooks*, 116 F.3d at 1369 (*citing Robertson v. Johnston*, 376 F.2d 43 (5th Cir. 1967)).

In considering a motion to dismiss, a court "will not accept, without more, conclusory allegations or legal conclusions masquerading as factual conclusions." *Robinson v. Jewish Ctr. Towers*, 993 F. Supp. 1475, 1476 (M.D. Fla. 1998); *see also Cummings v. Palm Beach County*, 642 F. Supp. 248, 249 (S.D. Fla. 1986)(noting that although "the federal rules of pleading are liberal . . . something more than conclusory allegations . . . are required.").

"In determining whether to grant a Rule 12(b)(6) motion, the Court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Watson v. Bally Mfg. Corp.*, 844 F. Supp. 1533, 1535 n.1 (S.D. Fla. 1993), *aff'd*, 84 F.3d 438 (11th Cir. 1996), quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 299 (1990).

Further, "where the plaintiff refers to certain documents in the complaint and these documents are central to the plaintiff's claim, . . . the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment." *Brooks*, 116 F.3d at 1369.

Fraud is subject to a heightened pleading requirement. In light of the severity of a fraud allegation, Rule 9(b) of the Federal Rules of Civil Procedure provides in pertinent part that "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." "This Rule 'serves an important purpose in fraud actions by alerting defendants to the "precise misconduct with which they are charged" and protecting defendants against "spurious charges of immoral and fraudulent behavior."'" *Brooks*, 116 F.3d at 1370-71 (*quoting City of Durham v. Business Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988)). Of course, the Court is mindful that the strict application of Rule 9(b) must not be allowed to vitiate the overall concept of notice pleading. *See, e.g., Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001). This Rule is satisfied if the complaint sets forth (1) the exact statements or omissions made, (2) the time and place of each such statement and who made the statement or

-4-

omission, (3) the substance of the statement and how it misled the plaintiff, and (4) the defendants' gain due to the alleged fraud. *See Brooks*, 116 F.3d at 1371.  With this standard in mind, the Court turns to the analysis of the case at hand.

## II.   BACKGROUND

This action arises out of a business relationship that went sour.  The primary parties involved in this business relationship were Collins Signs, Inc. ("Collins"), Nissan North America, Inc. ("NNA") and Nissan Motor Acceptance Corporation ("NMAC").  Collins is an Alabama corporation with its principal place of business in Dothan, Houston County, Alabama (Second Amended Complaint ("SAC"), ¶ 1).  NNA is a California corporation with its principal place of business in Gardena, California (SAC, ¶ 2).  NNA does business in Alabama and maintains a registered agent in Alabama (SAC, ¶ 2).  NMAC is a California corporation with its principle place of business located in Torrence, California (SAC, ¶ 3).

In 2001, Collins, NNA and NMAC became involved in a business relationship when NNA decided to undertake a re-imaging program that would entail both signage and non-signage activities.  As a part of this rebranding, NNA dealers across the United States were encouraged to install new signage and complete other updates to their showrooms.

At the time the re-imaging program was conceived, Image Point was the long preferred vendor for NNA's dealer development group (SAC, ¶ 65). Perry, Bossis and Smith were employed by the NNA dealer development group and had personal relationships with Image Point officers and employees including Martin, Christianson, Alford, Moye and Lester (SAC, ¶ 66). Perry, Bossis and Smith had a strong desire that the re-imaging contract be awarded to Image Point (SAC, ¶ 67).

NNA's procurement division was in charge of awarding the re-imaging contract (SAC, ¶ 68). Defendant Horton was employed by the procurement division (SAC, ¶ 66). NNA invited at least four companies, including Collins, Image Point, Everbrite, LLC and Icon Identity Solutions to bid on the contracts (SAC, ¶ 75). A pre-bid conference was held on July 26, 2001 (SAC, ¶ 77). The purpose of this conference was for NNA to explain how bidders were to complete the request for proposal ("RFP") and to answer any questions from prospective bidding companies (SAC, ¶ 77). Completed RFP's were due back on August 17, 2001 (SAC, ¶ 76).

In August, 2001, NNA decided to separate the re-imaging contract into two separate contracts, one for signage ("sign contract") and a separate non-signage ("L&E contract") contract (SAC, ¶ 81). The sign contract was to be awarded first, with the

L&E contract subject to a later procurement (SAC, ¶ 82).  Bidding on the contracts was done via an internet reverse auction (SAC, ¶ 82).

**Sign Contract**

In September, 2001, Horton called Collins on behalf of NNA to say that the Collins sign contract bid was the best financial bid and that NNA was beginning the due diligence inquiry necessary prior to the awarding of the re-imaging contracts (SAC, ¶ 85).  Later in September, Collins was informed that it was being offered the sign contract, but that the offer was on a "take-it-or-leave-it basis."  (SAC, ¶¶ 86, 95).  If Collins did not accept the terms as offered, NNA would offer the contract to the next bidder (SAC, ¶ 95).

While NNA's procurement division determined who was awarded the sign contract, Perry, Bossis and Smith, who were employed by NNA's dealer development group, were responsible for NNA's oversight and participation in the sign contract (SAC, ¶ 88).  Collins alleges that, prior to the execution of the sign contract, "Perry, Bossis and Smith formulated and executed a fraudulent scheme to make it impossible for [Collins] to perform the sign contract successfully, cause a pre-textural [sic] default, terminate the contract and cause the contract to be awarded to [Image Point] as they had intended and desired for it to be from the time the re-imaging program was conceived."  (SAC,

-7-

¶ 89).  As such, "acting in their capacities as managerial officers and agents of NNA . . . Perry, Bossis and Smith has no present intention to perform NNA's promises, obligations, and duties as promised under the sign contract at the time the contract was made" and "willfully failed to disclose" this material fact to Collins or to Horton and NNA's procurement division (SAC, ¶¶ 90-91, 93).

On October 3, 2001, Collins' representatives attended a kick off meeting at NNA's Gardena, California, offices where Collins executed the sign contract (SAC, ¶ 96).  NNA executed the sign contract two days later (SAC, ¶ 100).  While at NNA's offices, John Collins, President of Collins, had his first meeting with Bossis (SAC, ¶ 97).  The first words Bossis spoke to Collins were, "You've got this job and my f#@!ing phone had better not ring."  (SAC, ¶ 97).  When Collins stressed to Bossis the need for adequate communications to inform Nissan dealers of the impact the re-imaging program would have on their dealerships, Bossis responded, "We don't need to do that because NNA will handle all communications with the dealers."  (SAC, ¶ 98).

Under the sign contract's completion targets, Collins was to have 100 dealer sign installations completed by March 31, 2002 (SAC, ¶ 117).  Collins was allowed 129 days to complete the sign installation from the date a Nissan dealer enrolled in the

sign program (SAC, ¶ 118).  Thus, NNA needed to present Collins with 100 dealer enrollment forms no later than November 23, 2001, and 100 dealer participation agreement forms no later than January 10, 2002, so that Collins was in a position to meet the March 31, 2002, completion target (SAC, ¶¶ 117-18, 138).  Yet, by the end of November, 2001, Collins had only received 31 dealer enrollments for the sign program (SAC, ¶ 121).  Furthermore, Collins had not received a single dealer participation agreement ("DPA") by January 10, 2002, finally receiving the first DPA on January 13, 2002, and only receiving 25 DPA's by March 31, 2002 (SAC, ¶¶ 139, 168).  Thus, while Collins was supposed to have completed 100 installations by March 31, 2002, Collins had only received 25 DPA's by this date (SAC, ¶ 168).

Not only was NNA slow in getting signed dealer enrollments to Collins for the sign program, NNA also would hold signed enrollments and then submit them in bulk at one time.  For example, on December 11, 2001, Perry called an NNA employee, Joan Shibuya, who was in a meeting with John Collins at the time, and informed her that 40 dealer enrollments would be sent to Collins later that week (SAC, ¶ 133).  Shibuya informed Perry that she believed it was inappropriate to hold and batch enrollments like this, rather than to submit them to Collins as received (SAC,

¶ 133).  Perry disagreed, telling Shibuya that it was Collins'
responsibility to keep up with the sign contract timeline,
regardless of how or when the enrollments were submitted (SAC,
¶ 133).

On April 24, 2002, Bossis sent Collins a letter
expressing his lack of confidence in Collins' ability to perform
the sign and L&E contracts, but did not give any specific
criticisms or any specific corrective actions that would allay
his concerns (SAC, ¶ 144).  John Collins replied to Bossis the
same day that Bossis' letter was received, noting NNA's failure
to follow project guidelines, to timely process dealer
enrollments and DPAs, NNA's refusal to allow Collins to
communicate directly with Nissan dealers, and NNA's refusal to
allow Collins to employ field engineers (SAC, ¶ 145).

On May 3, 2002, Bossis sent a letter to Collins that
criticized Collins for only having installed signs at four
dealerships as of April 30, 2002, and informed Collins that it
was responsible for timely delivering the number of sign and L&E
installations required by the two contracts (SAC, ¶ 147).  In
addition, Bossis refused Collins' request to employ field
engineers (SAC, ¶ 147).

Collins renewed its request for field engineers in a
May 20, 2002, letter to Bossis, which asked for immediate
authorization to put field engineers in place (SAC, ¶ 148).  On

June 10, 2002, Horton, rather than Bossis, replied, refusing Collins' request for field engineers (SAC, ¶ 150).  Instead, Horton informed Collins that NNA was going to employ T&T Group to provide regional construction consultants who would inspect the installation sites, report on Collins' activities but who would not assist Collins (SAC, ¶¶ 149-50).

Collins wrote Horton, on June 24, 2002, asking that the scope of work by the regional construction consultants be expanded to perform the duties Collins had asked to be performed by field engineers (SAC, ¶ 152).  Horton replied on July 8, 2002, reiterating that the regional construction consultants were not to assist Collins but instead to see that Collins timely completed the contracted work and to hold Collins accountable to NNA (SAC, ¶ 153).

**L&E Contract**

In early October, 2001, NNA invited Collins and three other companies to bid on the L&E contract (SAC, ¶ 104).  In November, Horton and NNA telephoned Collins to report that Collins had submitted the best financial bid on the L&E contract (SAC, ¶ 109).  Collins was officially awarded the L&E contract in early November, 2001, and executed the contract on November 12, 2001 (SAC, ¶¶ 115-16).  NNA subsequently endorsed the L&E contract on December 4, 2001 (SAC, ¶ 124).

**Financial Issues**

Collins incurred substantial expenses in mobilizing for and performing on the sign and L&E contracts, expending $5,000,000 in mobilization and funding (SAC, ¶¶ 154, 167). In addition, NNA and NMAC failed to timely pay Collins' invoices and in most cases never paid invoices at all (SAC, ¶ 154). In fact, as of September 10, 2002, NNA and NMAC had not paid a single Collins invoice for a completed installation (SAC, ¶ 172). Thus, in August, 2002, when Smith was at Collins' Dothan, Alabama, facilities for a meeting, John Collins asked about the unpaid invoices and discussed the adverse impact NNA and NMAC's failure to pay was having on Collins' relationships with suppliers (SAC, ¶ 157). John Collins reminded Smith of the substantial mobilization costs incurred by Collins in regard to the sign and L&E contracts (SAC, ¶ 157).

Smith suggested that Collins send him a letter asking for a $6,000,000 deposit to be amortized against site installations at the rate of $6,000 per dealer site (SAC, ¶ 157). Smith and Collins jointly drafted the letter and with Smith's approval, Collins sent the letter to Smith on August 22, 2002 (SAC, ¶¶ 158-59).

The next day, Smith responded by falsely characterizing the request for a deposit as a request for a loan and expressed his disappointment that Collins would make such a request (SAC,

¶ 161).  Smith put forth a modified proposal for a loan including

a payment and performance bond, 100% personal loan guarantee by

John Collins, and a requirement that Collins agree to furnish NNA

with financial statements and submit to an independent audit

(SAC, ¶ 161).  John Collins replied by mail and e-mail correcting

Smith's characterization of Collins' request, pointing out that

it was to be a deposit towards mobilization expenses rather than

a loan (SAC, ¶ 162).  Collins refused to agree to Smith's terms

for the loan/deposit (SAC, ¶ 162).

On September 5, 2002, a meeting was held at NNA's

offices (SAC, ¶ 166).  John Collins and Smith communicated three

times prior to the meeting (SAC, ¶ 165).  John Collins was told

that the agenda for the meeting was limited to financial issues

and that he should bring his accountant or CFO to the meeting

(SAC, ¶ 165).  Collins attended the meeting along with Bill Carr,

Collins' accountant (SAC, ¶ 166).  Among those attending the

meeting for NNA and NMAC were Bossis, Smith, Horton and Doi along

with two attorneys (SAC, ¶ 166).  T&T was also represented at the

meeting by Cryer (SAC, ¶ 166).  At the meeting, John Collins

noted that Collins had invested $5,000,000 in mobilization and

funding for the contracts and was experiencing cash flow problems

because NNA and NMAC was not paying invoices for completed

installations (SAC, ¶ 167).  In response, instead of financial

discussions, Collins was peppered with operational questions even

though he had been told not to bring operations personnel to the meeting (SAC, ¶ 167).

On September 9, 2002, Horton sent a letter to Collins with a proposal for restructuring the sign and L&E contracts (SAC, ¶ 170).  On September 10, 2002, John Collins responded, rejecting Horton's proposal and requesting further negotiations in an attempt to resolve the contract problems (SAC, ¶ 171).

On September 13, 2002, Horton sent Collins a letter asking that Collins acknowledge that the August 22, 2002, letter, jointly drafted by Smith and John Collins, constituted an anticipatory repudiation of the sign contract (SAC, ¶ 173).  NNA sought to enter into a forbearance agreement under which Collins would issue a $2,000,000 payment and performance bond (SAC, ¶ 173).  Under the proposed forbearance agreement, if Collins failed to issue the $2,000,000 performance bond, then NNA could terminate the sign contract and owe no liability to Collins (SAC, ¶ 173).  The proposed forbearance agreement was illusory in that NNA could terminate the forbearance and pursue all remedies for anticipatory breach against Collins if NNA management did not approve the forbearance agreement (SAC, ¶ 173).  Collins declined to enter into the proposed forbearance agreement (SAC, ¶ 174). Collins formally rejected Horton's proposals for restructuring the sign contract on September 30, 2002 (SAC, ¶ 177).

-14-

On October 15, 2002, Horton wrote Collins, declaring an anticipatory breach of the sign contract based on the August 22nd Collins/Smith letter, Collins' alleged failure to meet target completion dates, alleged incomplete or unacceptable installations and Collins' inability to financially perform the contract (SAC, ¶ 183).  NNA demanded Collins agree to additional demands as a condition of going forward (SAC, ¶ 183).  One of the demands was that Collins provide a list of its contract sign installers by area which would make it easier for NNA and NMAC to transition to another sign supplier by being able to give the new supplier a list of installers already familiar with the sign contract work requirements (SAC, ¶ 184).

On October 18, 2002, Collins replied to Horton, denying any anticipatory breach and reaffirming its commitment to perform the sign contract (SAC, ¶ 185).  On October 23, 2002, Collins offered to submit to an audit and provide a $2,000,000 payment and performance bond to allow the sign contract to go forward to completion (SAC, ¶ 186).  On October 25, 2002, Horton accepted Collins' proposal (SAC, ¶ 188).  Collins furnished NNA with a $2,000,000 performance bond issued by Fireman's Fund Insurance Company on October 31, 2002 (SAC, ¶ 189).  Still, NNA and NMAC did not pay outstanding invoices from Collins (SAC, ¶ 190).

On November 8, 2002, Horton wrote Collins and alleged that Collins had breached the sign contract and informed Collins

that NNA was looking for a different supplier to replace Collins (SAC, ¶ 192).  On November 14, 2002, Collins replied to Horton and refuted his breach of contract assertions (SAC, ¶ 193).

On November 27, 2002, representatives of Collins met with representatives of NNA and NMAC (SAC, ¶ 194).  At this meeting, Collins terminated the sign and L&E contracts because of NNA and NMAC's failure to pay Collins' submitted invoices (SAC, ¶ 194).  NNA and NMAC agreed to the termination (SAC, ¶ 194).  All parties sent letters confirming the contract termination (SAC, ¶¶ 197-98).

Later, NNA and NMAC sent Collins a "Voluntary Termination and Release Agreement."  (SAC, ¶ 195).  Collins did not agree to or execute this document (SAC, ¶ 195).

Collins used good faith and reasonable efforts to assist NNA in its transition to a new vendor (SAC, ¶ 200).  NNA entered into an agreement with Image Point to complete the sign contract (SAC, ¶ 201).

In December, 2002, Smith came to Collins' manufacturing plant in Dothan, Alabama, and insisted that Collins turn over the detail engineering and manufacturing automation drawings for plating and tool paths to manufacture the NNA sign types (SAC, ¶ 202).  PNC Bank National Association ("PNC Bank") had a perfected security interest in these drawings (SAC, ¶ 204).  Smith, on behalf of NNA, promised to pay Collins $97,000 for

these drawings (SAC, ¶ 202).  In reliance on this promise,
Collins permitted Smith and NNA to take the drawings which Smith
then delivered to Image Point (SAC, ¶¶ 202-03).  Smith and NNA
had no present intent to pay for the drawings and subsequently
did not pay for them (SAC, ¶ 202).  By taking the drawings
without paying for them, Smith, NNA and Image Point interfered
with PNC Bank's security interest (SAC, ¶ 207).

On December 18, 2002, Collins wrote NNA requesting
payment of the amounts due to Collins under the sign contract
upon termination (SAC, ¶ 208).  NNA refused to pay Collins any
amount upon termination of the sign contract (SAC, ¶ 208).

Bunker Plastics ("Bunker") supplied Collins with sign
faces which Bunker manufactured from raw materials supplied by
Collins (SAC, ¶ 214).  Bunker used tools, dies and molds supplied
and bailed to Bunker by Collins to fabricate parts for Collins
(SAC, ¶ 214).  PNC Bank has a perfected security interest in the
tools, dies and molds (SAC, ¶ 216).

On January 17, 2003, Collins' attorney wrote to
Bunker's President Parkinson seeking return of the bailed tools,
dies and molds to Collins (SAC, ¶ 217).  Bunker wrote Collins,
informing Collins it was refusing to return the tools, dies and
molds and informing Collins that these would be delivered to NNA
(SAC, ¶ 218).  NNA paid Bunker $128,000 for Bunker's accounts
receivables from Collins and for delivery of the tools, dies and

-17-

molds (SAC, ¶ 219).   Purchase of the accounts receivable also
gave NNA creditor status in an involuntary bankruptcy proceeding
(SAC, ¶ 222).

          The NNA and NMAC defendants conspired to force Collins
into an involuntary Chapter 11 bankruptcy (SAC, ¶ 224).   Other
creditors were enlisted including Ken-Mac (SAC, ¶ 226).   Ken-Mac
is a wholly-owned subsidiary of ThyssenKrupp Materials, NA, Inc.,
which is a wholly-owned subsidiary of ThyssenKrupp, AG (SAC,
¶ 226).   Thyssen Krupp AG is a German corporation which is a
major NNA supplier at its manufacturing facilities in Smyrna,
Tennessee, Canton, Mississippi, and elsewhere (SAC, ¶ 226).

          In February, 2003, ThyssenKrupp, at the request and
urging of NNA, Perry, Bossis, Smith and Horton, through its Ken-
Mac subsidiary began contacting other creditors and represented
that Collins was planning to sell its assets to Cummings and then
file a Chapter 7 bankruptcy to avoid its creditors and allow John
Collins to take all of the sale proceeds, leaving the creditors
with uncollectible debts (SAC, ¶ 227).   Ken-Mac persuaded LSI
Industries, Inc., and Brackin Wholesale to join with it in filing
an involuntary Chapter 11 bankruptcy petition against Collins
(SAC, ¶ 228).   Collins submitted to the jurisdiction of the
bankruptcy court and sought to effect an orderly reorganization
or liquidation for the benefits of its creditors and equity owner
(SAC, ¶ 229).

NNA filed a false claim with the bankruptcy court for $5,099,000 for alleged breach of contract (SAC, ¶ 230).

NNA and Ken-Mac opposed Collins' proposed Chapter 11 bankruptcy plan of liquidation and requested that the Court convert the case to a Chapter 7 liquidation (SAC, ¶ 231).  The bankruptcy court granted the motion converting the proceeding to Chapter 7.  The plaintiff was appointed as trustee (SAC, ¶ 231).

This action was originally brought by Collins (Filing No. 1).  In response to motions to dismiss, the plaintiff was substituted for Collins and an amended complaint was filed (Filing No. 109).  New motions to dismiss were filed in response to the first amended complaint (Filing Nos. 110, 113, 117 and 122).  Plaintiff sought leave to amend its complaint a second time (Filing No. 131) which the Court granted (Filing No. 146).  Plaintiff then filed its second amended complaint (Filing No. 147).

### III.  DISCUSSION

### Claim 1 - Promissary Fraud

Under Alabama law, the elements of a promissary fraud claim are: "(1) a misrepresentation, (2) of a material existing fact, (3) on which the plaintiff relied, and (4) which proximately caused injury or damage to the plaintiff." *Goodyear Tire & Rubber Co. v. Washington*, 719 So. 2d 774, 776 (Ala. 1998).  In addition, "to support a claim of promissory fraud, the

-19-

plaintiff must show that at the time of the alleged
misrepresentation (that is, the promise), the defendant intended
not to do the act or acts promised, but intended to deceive the
plaintiff." *Id.*  "The only basis upon which one may recover for
fraud, where the alleged fraud is predicated on a promise to
perform . . . some act in the future . . . is when the evidence
shows that, at the time . . . the promises of future action
. . . were made, the promisor had no intention of carrying out
the promises, but rather had a present intent to deceive."
*Centon Elecs., Inc. v. Bonar*, 614 So.2d 999, 1003 (Ala.
1993)(*quoting Hearing Sys., Inc. v. Chandler*, 512 So.2d 84, 87
(Ala. 1987), *quoting in turn Purcell Co. v. Spriggs Enters.,
Inc.*, 431 So. 2d 515, 519 (Ala. 1983)).  Absent "a present intent
to deceive," a promissary fraud claim is fatally deficient.
*Hanners v. Balfour Guthrie, Inc.*, 564 So.2d 412, 414 (Ala.
1990)(*quoting Hearing Systems, Inc.*, 512 So.2d at 87.

      1.   Bunker, Image Point, T&T and Ken-Mac Defendants and
          Individual Defendants Horton, Doi and Wakisaka

      The Bunker, Image Point, T&T and Ken-Mac Defendants
along with the individual defendants Horton, Doi and Wakisaka ask
the Court to dismiss the promissary fraud claim brought against
them because plaintiff has failed to assert specific facts
demonstrating that these defendants had the present intention not
to perform a promised act, at the time of the alleged
misrepresentation.  Under Alabama law, plaintiff's promissary

fraud claim is fatally deficient as to these defendants if the complaint lacks specific facts that they possessed a present intent not to perform at the time of the alleged misrepresentation.

Plaintiff's second amended complaint ("Complaint") asserts that the alleged misrepresentation occurred when Collins Signs entered "into the sign contract and the [L&E] contract with NNA and NMAC" but where, at the time of signing the contract, NNA, NNMC and/or employees of NNA or NMAC had a present intent not to perform the promised acts under the contract (SAC, ¶ 238). Nowhere in the Complaint does plaintiff allege that the Bunker, Image Point, T&T or Ken-Mac Defendants or the individual defendants Horton, Doi and Wakisaka possessed a present intent not to perform any promised acts at the time that Collins entered into the sign contract and the L&E contract with NNA and NMAC. Thus, the Complaint fails to state a claim for promissary fraud against the Bunker, Image Point, T&T or Ken-Mac Defendants as well as the individual defendants Horton, Doi and Wakisaka. Therefore, the promissary fraud claim will be dismissed as to these defendants.

2.    NMAC, NNA, Perry, Bossis and Smith

The Complaint states that the alleged misrepresentation occurred when Collins Signs entered "into the sign contract and the L&E contract with NNA and NMAC" but where, at the time of

signing the contract, NNA, NNMC and/or employees of NNA or NMAC had a present intent not to perform the promised acts under the contract (SAC, ¶ 238).  The Complaint asserts that NNA, NMAC, Perry, Bossis and Smith had a present intention at the time the contracts were signed not to perform the promised acts under the contract (SAC, ¶¶ 129-30).  This intention not to perform is the misrepresentation of a material fact.  Furthermore, the Complaint asserts that Collins Signs relied on this misrepresentation and was injured (SAC, ¶ 232).  Thus, the plaintiff has adequately pled a claim for promissary fraud as to these defendants. Therefore, the motion to dismiss the promissary fraud claim will be denied as to defendants NNA, NMAC, Perry, Bossis and Smith.

**Claim 2 - Conversion and Misappropriation**

Under Alabama law, conversion is the wrongful exercise of domain over the property of another.  *Riscorp, Inc. v. Norman*, 915 So.2d 1142, 2005 Ala. LEXIS 37, at *26 (Ala. 2005).  "To sustain a claim of conversion, there must be (1) a wrongful taking; (2) an illegal assertion of ownership; (3) an illegal use or misuse of another's property; or (4) a wrongful detention or interference with another's property."  *Gray v. Liberty Nat'l Life Ins. Co.*, 623 So.2d 1156 (Ala. 1993).

The Complaint alleges that the NNA and NMAC Defendants are subject to liability to the Trustee for conversion and misappropriation of Collins Signs' raw materials, tools, dies,

molds, furniture, fixtures, equipment, work in progress, finished goods, designs, improvements, discoveries and intellectual property (SAC, ¶ 243).  The Complaint alleges that the contracts should be found *void ab initio* (SAC, ¶ 243(b)).

      1.    NNA and NMAC

      The NNA and NMAC Defendants allege that the conversion and misappropriation claim should be dismissed because, under the terms of the contracts, the property at issue could not be converted as it already belonged to NNA (Sign Contract ¶¶ 11.1 and 11.3).

      While these defendants appear to correctly recite their rights to the property under the contract terms, this position fails to account for plaintiff's position that the contract is *void ab initio*.  If the contract is void, then the contractual rights asserted by these defendants are not available to shield the defendants from liability for conversion and misappropriation.  Under the standards for a motion to dismiss, the Court finds that plaintiff has sufficiently stated a claim for conversion and misappropriation.  Thus, the NNA and NMAC Defendants' motions to dismiss this claim will be denied.

      2.    Smith, Bossis and Perry

      The Complaint specifically alleges that "on behalf of NNA, Smith promised to pay Collins $97,000 for these drawings (SAC, ¶ 202).  In reliance on that promise, Collins permitted

Smith and NNA to take the drawings (SAC, ¶ 202).  Smith and NNA had no present intent to perform the promise to pay when they made it." (SAC, ¶ 202).  Thus, the Complaint sufficiently asserts a wrongful detention or interference with Collins' property so as to state a claim for conversion by Smith. Therefore, the motion to dismiss the conversion claim as to Smith will be denied.

While the Complaint specifically alleges Smith's involvement in NNA's conversion of plaintiff's property, the conversion claim makes no similar allegations as to NNA employees Bossis and Perry, and the Court will dismiss the conversion claim as to these two defendants.

3.    Image Point Defendants

The Complaint alleges that Image Point took possession of detailed engineering and manufacturing and automation drawings for plating and tool paths when Smith and NNA delivered these drawings to Image Point (SAC, ¶¶ 202-203, 205).  Collins delivered the drawings to NNA and Smith after Smith promised to pay Collins $97,000 for the drawings (SAC, ¶ 202).  Subsequently, plaintiff alleges that NNA and Smith never paid the $97,000 owed, and that NNA and Smith never had a present intention to pay for the drawings (SAC, ¶ 202).

Even accepting all of plaintiff's assertions as true, plaintiff's Complaint fails to state a claim for conversion as to

-24-

the Image Point Defendants because plaintiff never alleges (1) a wrongful taking; (2) an illegal assertion of ownership; (3) an illegal use or misuse of another's property; or (4) a wrongful detention or interference with Collins' drawings by Image Point. The drawings were delivered to NNA and Smith by Collins (SAC, ¶ 202).  Next, NNA and Smith delivered the drawings to Image Point (SAC, ¶ 203).  While the Complaint may state a conversion claim against NNA and Smith, it does not state such a claim against the Image Point Defendants.  Therefore, the conversion claim will be dismissed as to the Image Point Defendants.

    4.   Bunker Defendants

        The Complaint alleges that the Bunker Defendants delivered property belonging to Collins to NNA and NMAC after Collins demanded that Bunker return possession of bailed tools, dies and molds to Collins (SAC, ¶¶ 217-219).  Bunker Plastics transferred the tools, dies and molds to NNA in reliance on Sign Contract language which gives NNA ownership of these goods and after NNA paid Bunker $128,000 for the accounts receivable that Collins owed to Bunker (SAC, ¶ 219).

        Accepting the allegations of the Complaint as true for purposes of the motion to dismiss, the Court finds that the plaintiff has sufficiently pled a claim of conversion as to the Bunker Defendants because Bunker's refusal to deliver the goods to Collins may amount to a wrongful detainer of Collins' goods

-25-

under Alabama law.  The Bunker Defendants' motion to dismiss this claim will be denied.

        5.   Other Defendants

        Several defendants will be dismissed from the second claim because the Complaint fails to state a claim against them upon which relief can be granted because the Complaint does not contain any allegations that these parties converted or misappropriated property belonging to Collins Signs.  Thus, the second claim of the Complaint alleging conversion and misappropriation will be dismissed as to individual defendants Horton, Doi and Wakisaka, as well as the T&T Defendants (which includes T&T Group, T&T USA, and Cryer) and the Ken-Mac Defendants (including Parsons and Long).

**Claims 3-6 - RICO**

        Claims three through six of plaintiff's second amended complaint fail to allege a pattern of racketeering activity, and thus, are subject to dismissal for failure to state a claim. Sections 1962(a)-(c) of RICO require a showing that the defendant engaged in a "pattern of racketeering activity."[1]  A claim under

---

        [1]  Section 1962(b) makes it a crime "for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."  18 U.S.C. § 1962(b).  Section 1962(c) makes it illegal "for any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  18 U.S.C. § 1962(c).

§ 1962(d) cannot be made in the absence of a viable claim under
either §§ 1962(a), (b) or (c).  *Steco Inc. v. S&T Mfg., Inc.*, 772
F.Supp. 1495, 1503 (E.D. Pa. 1991).  To satisfy RICO's "pattern
of racketeering activity" requirement, plaintiff must allege (1)
that a defendant committed two or more federal criminal offenses,
often referred to as "predicate acts," within a ten-year time
span, (2) that those predicate acts are related to one another,
and (3) that those predicate acts demonstrate a continuing nature
of criminal conduct.  *See, e.g., H.J. Inc. v. Northwestern Bell
Tel. Co.,* 492 U.S. 229, 239-43 (1989); *Sedima S.P.R.L. v. Imrex
Co.*, 473 U.S. 479, 496-97 (1985); *Jones v. Childers*, 18 F.3d 899,
910-11 (11th Cir. 1994).  As discussed below, this third element,
requiring a continuing nature of criminal conduct, is missing
from plaintiff's proposed claims three through six.

Plaintiff must articulate at least two predicate acts,
with one occurring after RICO's enactment and the other occurring
within ten (10) years, in order to plead a pattern of
racketeering activity that will sustain a RICO cause of action.
Conspiracy to commit fraud, mail fraud or wire fraud are
specified predicate acts that will sustain a RICO claim.  28
U.S.C. § 1961(1).  In order, however, for this Court to determine
whether plaintiff satisfied this element, plaintiff needs to
articulate with specificity defendants' conduct that comprises
these acts because RICO actions, like fraud, must be pled with

-27-

particularity. *Delfrate v. Letts*, 1996 U.S. Dist. LEXIS 10670 at
*14-15 (M.D. Fla.  1996).  "Adopting the standards of
journalistic endeavor, this Court determines that articulating
predicate acts with specificity means answering the old and
familiar questions of who, when, where, how, and why." *Id.* at
*14.  Additionally, "claims under [the Federal Racketeering
Influenced and Corrupt Organizations Act (RICO), Title 18, United
States Code, Section 1961, et seq.] must be subjected to scrutiny
due to their potential for abuse by civil litigants." *Bill Buck
Chevrolet v. GTE Fla.*, 54 F.Supp. 2d 1127, 1137 (M.D. Fla. 1999)
(*quoting Ste Ame Isorait v. Atlantic Mut. Cos.*, 1993 U.S. Dist.
LEXIS 1388, 1993 WL 37330, at *3 (E.D.N.Y. 1993)).

        In the present action, plaintiff has failed to answer
the who, when, where, how, and why with sufficient specificity as
to the RICO claims alleged against the twenty-two defendants.
For example, plaintiff's mail fraud allegation states that
"Defendants repeatedly caused matters and things to be delivered
by the United States Postal Service and international or
interstate courier in repeated violation, or attempted violation,
of 18 U.S.C. § 1341." (SAC, ¶ 259).  Plaintiff's wire fraud
allegation uses the same nonspecific language, stating that
"Defendants repeatedly transmitted, or caused to be transmitted
by means of interstate and international wire, writings, signs,

signals, pictures and sound communications, in repeated violation, or attempted violation, of 18 U.S.C. § 1343." (SAC, ¶ 264).  Both allegations suffer the infirmity of failing to specify which defendant and which transmission with requisite specificity.  Plaintiff has been allowed to amend its complaint twice, yet still fails to plead its RICO claims with sufficient specificity.  The Court next asked plaintiff to complete a "RICO statement" to better clarify several issues, only to have plaintiff's reply consist of simply cutting and pasting extensively from its earlier briefs without providing the necessary specificity.  Therefore, the Court will dismiss the RICO claims as to all defendants because the plaintiff has failed to plead these claims with the requisite specificity necessary under Federal Rule of Civil Procedure 9(b).

**Claim 7 - Quantum Meruit and Unjust Enrichment**

The seventh cause of action in plaintiff's Complaint seeks relief against NNA and NMAC on the grounds of quantum meruit and unjust enrichment.  Where NNA and NMAC were parties to contracts with Collins, and where the plaintiff is seeking rescission of these contracts, plaintiff has sufficiently pled this claim so as to survive a motion to dismiss.  NNA and NMAC's motion to dismiss this claim will be denied.

**Claim 8 - Breach of Sign Contract**

NMAC seeks dismissal of this claim asserting that it is not a party to the contract.  NMAC is incorrect.  The contract specifically states that the sign contract was entered into by NNA, NMAC and Collins (Filing No. 166-2, Sign Contract, Pg. 2).  Therefore, NMAC's motion to dismiss this claim will be denied.

**Claim 9 - Breach of Louvers and Entry Contract**

NMAC also seeks dismissal of the claim for breach of the louvers and entry ("L&E") contract, asserting that it is not a party to the contract.  Here, NMAC is correct.  Unlike the sign contract, NMAC is not a party to the L&E contract entered into by NNA and Collins (Filing No. 166-3, L&E Contract).  Where NMAC is not a party to the contract, they cannot be found in breach of the contract.  Therefore, NMAC's motion to dismiss this claim will be granted.  Accordingly,

IT IS ORDERED:

1) The motions to dismiss all claims as to the Image Point Defendants, T&T Defendants and Ken-Mac Defendants as well as defendants Horton, Doi and Wakisaka are granted;

2)  The Bunker Defendants' motion to dismiss the promissary fraud (Claim 1)and RICO claims (Claims 3-6) are granted; their motion to dismiss as to the conversion and misappropriation claim (Claim 2) is denied;

-30-

3)   The motion to dismiss the RICO claims (Claims 3-6) as to defendant Perry is granted; his motion to dismiss the promissary fraud (Claim 1) and conversion and misappropriation (Claim 2) claims is denied;

4)   The motion to dismiss the RICO and conversion and misappropriation claims (Claims 2-6) as to defendants Bossis and Smith is granted; their motion to dismiss as to the promissary fraud claim (Claim 1) is denied;

5)   The Court will grant the motion to dismiss the RICO claims (Claims 3-6) and the breach of the louvers and entry contract claim (Claim 9) as to defendant NMAC; NMAC's motion to dismiss the promissary fraud (Claim 1), conversion and misappropriation, (Claim 2) quantum meruit and unjust enrichment, (Claim 7)and breach of the sign contract (Claim 8) claims is denied; and

6)   The motion to dismiss the RICO claims (Claims 3-6)as to defendant NNA is granted; NNA's motion to dismiss the promissary fraud (Claim 1), conversion and misappropriation, (Claim 2) and quantum meruit and unjust enrichment (Claim 7) claims is denied.

DATED this 2nd day of May, 2006.

BY THE COURT:

/s/ Lyle E. Strom

_____
LYLE E. STROM, Senior Judge
United States District Court

-31-