```
              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF ALABAMA
                        SOUTHERN DIVISION

SUSAN S. DePAOLA, Chapter 7    )
Bankruptcy Trustee for         )
Collins Signs, Inc.,           )
                               )
           Plaintiff,          )       1:04CV267
                               )
      v.                       )
                               )
NISSAN NORTH AMERICA, INC.;    )       MEMORANDUM OPINION
ERIC SMITH,                    )
                               )
           Defendants.         )
_____)
```

INTRODUCTION

This matter came before the Court for trial from April 14 through May 8, 2008. At the close of all the evidence, both parties rested and moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a), upon which the Court reserved ruling. Following closing arguments, the jury returned advisory verdicts in favor of the plaintiff on her claims for promissory fraud, conversion, and punitive damages, and a verdict in favor of the plaintiff on defendant Nissan North America, Inc.'s ("NNA") breach of contract counterclaims. NNA later moved the Court for findings of fact and conclusions of law pursuant to Rule 52(a) with respect to plaintiff's equitable claims (Filing No. 451), and NNA and Eric Smith (the "Nissan Defendants") moved for judgment as a matter of law or, in the alternative, a new trial or, in the alternative, remittitur (Filing No. 452), while the plaintiff moved for entry of judgment on jury verdict and for

litigation expenses including attorney's fees (Filing No. 453). The Court, having considered the motions, the evidence, the briefs and arguments of counsel, and the applicable law, will grant NNA's motion for findings of fact and conclusions of law, will grant in part the Nissan Defendants' motion for judgment as a matter of law or, in the alternative, a new trial or, in the alternative, remittitur, will deny all other pending motions, and enters the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## FINDINGS OF FACT

The parties have stipulated to the following facts which the Court expressly adopts:

1) In 1999, Nissan adopted a series of initiatives designed to revitalize the Nissan brand image worldwide, including a new line of vehicles, strong brand management and the re-imaging of Nissan dealerships worldwide.

2) In connection with this initiative, NNA commenced work in 2000 on the National Retail Environmental Design Initiative Program ("NREDI") which provided incentives to Nissan dealers nationwide to participate in a brand re-imaging program.

3) It was the responsibility of Nissan's procurement department (the "Purchasing Department") to award contracts under NREDI to suppliers and vendors on behalf of NNA, including (a) a marketing design contract for the design of a new Nissan brand

mark; (b) an architectural contract for the design of dealership improvements; (c) a project management contract for project management services; (d) a contract for a sign prototype to be displayed to dealers; (e) a sign contract for the design, manufacture and installation of new, standardized Nissan brand signs (the "Sign Contract"); and (f) a facilities contract for the installation of standardized architectural elements such as louvers and entryways (the "L&E Contract").

4) In total, these contracts represented roughly a $200 million capital outlay by NNA.

5) In April 2000, the Purchasing Department awarded the program management contract to Turner & Townsend ("T&T").

6) The Purchasing Department awarded the Sign Contract through a competitive bid process utilizing an on-line reverse auction.  In a reverse auction, the successful bidder provides the lowest bid, rather than the highest.

7) Prior to conducting the reverse auction, the Purchasing Department pre-qualified potential bidders.  In order to pre-qualify bidders, T&T prepared a request for information ("RFI") that was sent out to established sign companies that had expressed interest in NREDI.

8) Four companies responded to the RFI: (a) Collins Signs, Inc. ("CSI"), (b) Plasti-Line, (c) Everbrite, and (d) ICON Identity Solutions.  On or about July 2001, based on its review

of the information provided in response to the RFI, T&T determined that all four companies met the threshold requirements to qualify for bidding at the reverse auction. T&T then issued a request for proposal ("RFP") that comprehensively outlined the specifications and requirements of the re-imaging program. The RFP was later included as part of the Sign Contract.

9) The reverse auction was held in August, 2001. CSI was the low bidder, and thus the winner, at the close of the auction.

10) On October 3, 2001, CSI attended a kick-off meeting at NNA's Gardena, California, offices where John Collins signed the Sign Contract on behalf of CSI; on October 5, 2001, Emil Hassan, Senior VP, Quality, Purchasing and Logistics, signed the Sign Contract on behalf of NNA.

11) On or about October 9, 2001, the Purchasing Department awarded the L&E Contract to CSI. John Collins signed the L&E contract on behalf of CSI on November 12, 2001; Hassan signed for NNA on December 4, 2001.

12) It was the responsibility of NNA's Brand Management Department, in concert with T&T, to administer the contracts on behalf of NNA.

13) Director Mark Perry, Senior Manager Peter Bossis and Manager Eric Smith are or were employees of the Brand Management Department. Smith reported to Bossis, who in turn

reported to Perry. Smith's sole job function was the administration of the contracts.

14) The essential phases of the program were as follows: (a) the design and approval of signage; (b) the manufacture of signage; (c) obtaining consent forms from dealers to conduct facility surveys; (d) conducting surveys; (e) preparing dealer participation packages ("DPPs"), which described the family of signs that were being proposed for a particular dealership and the pricing for those signs, based on surveys; (f) obtaining dealer approvals of DPPs; (g) obtaining installation permits; and (h) installing signage or louvers and entryways.

Except where otherwise noted, the Court makes the following additional findings of fact by a preponderance of the evidence:

15) Plasti-Line was NNA's existing and preferred sign vendor. Plasti-Line was also the winner of the contract to produce the sign prototype that would be displayed to dealers.

16) Bossis knew Plasti-Line employee Ken Williams.

17) Although the Purchasing Department awarded the Sign Contract to CSI, Perry, Bossis and Smith would have preferred that Plasti-Line had been the successful bidder and awarded the contract.

18) After John Collins had signed the Sign Contract on behalf of CSI, at the October 3, 2002 kick off meeting, Bossis

stated to John Collins that his "fucking phone better not ring for any reason."

19) Although the contracts provided otherwise, Bossis directed John Collins that CSI would not have direct contact with NNA dealers.

20) Bossis imposed extra-contractual obligations on CSI, such as requiring that it carry more inventory than it anticipated, which caused CSI cash flow problems.

21) NNA insisted on accumulating DPPs and transmitting them to CSI in batches, rather than as they came in, causing CSI to incur increased costs.

22) The events described in Paragraphs 20-21 occurred after the contracts had already been entered into.

23) The sign program was an important project for NNA, representing approximately a $200 million capital outlay.

24) Perry, Bossis and Smith's careers at NNA depended on the success of the re-imaging program generally and the sign program specifically.

25) The Brand Management Department and T&T participated in training programs with CSI employees and subcontractors, as well as in regular meetings that were held to review CSI's progress and to address any issues that may have arisen.

26) Some employees of Perry, Bossis, and Smith in the Brand Management Department were helpful to CSI in their efforts to perform the contracts.

27) On April 15, 2008, as trial began, DePaola moved to withdraw her breach of contract claims; which motion the Court granted.

28) There is no direct evidence that Perry, Bossis, Smith or NNA did not intend to perform the contracts at the time they were entered into.

29) It cannot be fairly and reasonably inferred from the circumstantial evidence that Perry, Bossis, Smith or NNA did not intend to perform the contracts at the time they were entered into and the Court finds that Perry, Bossis, Smith and NNA intended to perform the contracts at that time.

30) Perry, Bossis, Smith and NNA did not intend to deceive CSI by not performing the contract at the time it was entered into.

31) At the time the contracts were entered into, both CSI and NNA reasonably believed that the other party intended to perform according to the contract terms.

32) NNA made no misrepresentation regarding its intent to perform at the time of contracting.

33) The tools, dies, molds, plans and drawings were owned by NNA.

34) DePaola has failed to prove by clear and convincing evidence that NNA engaged in oppression, fraud, wantonness, or malice with regard to CSI.

## CONCLUSIONS OF LAW

DePaola brought claims against NNA for promissory fraud, conversion, and punitive damages and against Eric Smith for conversion.

The elements of a claim for promissory fraud are that: (1) defendant made the promise; (2) when defendant made the promise it intended to deceive plaintiff by not keeping the promise; and (3) plaintiff acted and was harmed.  1 Ala. Pattern Jury Instr. Civ. § 18.07.  The parties stipulated and the Court has found that NNA and CSI entered into a written contract.  There is therefore no question that NNA made a promise or that CSI acted thereon.  However, the Court finds that DePaola failed to prove by a preponderance of the evidence that NNA intended to deceive CSI by not keeping the promise at the time the agreement was entered into.  This is fatal to DePaola's claim for promissory fraud.

It is true that the advisory jury found to the contrary -- that NNA did not intend to perform the terms and conditions of the contracts at the time they were entered into.  (*See* Filing No. 444.)  The Court has carefully considered the advisory jury's verdict with respect to the element of intent to deceive at the

time of the promise and examined the evidence upon which it rests.  Because this is a claim for the equitable remedy of rescission, the Court must make its own findings of fact and conclusions of law.  "The verdict of the advisory jury is merely for the purpose of 'enlightening the conscience of the Chancellor.'"  *Conner v. City of Dothan*, 500 So.2d 1065, 1066 (Ala. 1986) ("The verdict of an advisory jury . . . is not binding on the trial judge.").  In this case, the Court respectfully disagrees with the verdict of the advisory jury and finds that DePaola failed to prove intent to deceive at the time of contracting by a preponderance of the evidence.

Most of the evidence upon which DePaola relies to show an intent to deceive by NNA at contract formation occurred long after performance began and therefore, while relevant, it is minimally persuasive.  For example, the requirement by Bossis that CSI carry additional inventory or the transmission of DPPs in batches are facts that a factfinder could regard as evidence that NNA did not want CSI to succeed in performing the contract *at that later time*.  These acts could also be evidence of a breach of the contracts.  However, they say little about NNA's state of mind at the time the contracts were entered into. Similarly, Smith's request or suggestion that CSI solicit financial assistance from NNA, whatever his motives, occurred toward the end of the relationship.  The only evidence

contemporaneous with contract formation is Bossis's statement that his phone better not ring and the communication to John Collins that CSI would not be communicating directly with the dealers.  But this evidence tends to show not that NNA had no intent to perform the contract but rather that Bossis's expectation was that any executory issues would not rise to his level of management and that Bossis, unaware of the exact terms of the contract, intended for his department to participate more directly in its execution than John Collins expected.

     The failure of DePaola's claim for promissory fraud also destroys her claims for conversion.  DePaola sought to rescind the contracts from their inception due to the alleged fraud.  Because the fraud claim fails, the contracts were in full effect.  The sign contract states that "the parties agree that all materials and products . . . created by [CSI] for [NNA] as part of the Services shall be owned by [NNA] and shall be considered works made for hire by [CSI] for [NNA]."  (Ex. 2009, at ¶ 11.1.)  That contract defines materials as including without limitation:  "documents, designs, drawings, calculations, proposals, software, source code, object code, specifications, tools, samples, mock-ups, prototypes, final product, records, compilations, artistic works, data, reports, and electronic media diskettes."  *Id.*  Similarly, the louvers and entryways contract states that "the parties agree that all materials and products

. . . created by [CSI] for Nissan . . . shall be owned by Nissan and shall be considered as a license for use by [CSI] from Nissan." (Ex. 2010, at ¶ 11.1.) In either Texas or Alabama, the two states where DePaola alleged conversions took place, conversion requires that the thing allegedly converted be wrongfully taken from its rightful owner or possessor. *See Singer Asset Fin. Co. v. Conn. Gen. Life Ins. Co.*, 975 So.2d 375, 831-82 (Ala. Civ. App. 2007); *Ojeda v. Wal-Mart Stores, Inc.*, 956 S.W.2d 704, 707 (Tex. App. 1997). Because the contracts were not rescinded, NNA could not have wrongfully taken the tools, dies, molds, plans or drawings because under the contracts, it was their rightful owner. DePaola can have no claim for conversion against the true owner, NNA, or against its agent, Smith.

For similar reasons, DePaola's claim for punitive damages also fails. Both the Sign Contract and the L&E Contract specifically exclude damages or claims not provided for in the contracts, and punitive damages are not referenced or provided for therein. (*See* Ex. 2009, at ¶ 8.1; Ex. 2010, at ¶ 8.3.) DePaola's punitive damages claim also fails because she has failed to prove by clear and convincing evidence that either NNA or Smith consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to CSI. The Court has found that DePaola did not prove by a preponderance of the evidence that NNA committed promissory fraud; therefore NNA

cannot be found to have committed fraud by clear and convincing evidence.  Moreover, DePaola cannot demonstrate any oppression, wantonness, or malice by NNA or Smith regarding her conversion claims because, as discussed above, NNA was the true owner of the tools, dies, molds, plans and drawings.  For each of these reasons, DePaola's claim for punitive damages will be dismissed.

   With respect to NNA's counterclaim, the jury returned a verdict in favor of DePaola and against NNA.  The Nissan Defendants have moved for a new trial (*See* Filing No. 452) and, for two reasons, the Court finds that the motion should be granted on this issue.  First, the jury's verdict is contrary to the great weight of the evidence.  In disposing of the counterclaim, the jury answered "No" to special interrogatories that "NNA has proven by a preponderance of the evidence . . . [t]hat NNA and CSI entered into a valid and binding sign contract . . ." and that "NNA and CSI entered into a valid and binding louvers and entry contract."  (Filing No. 444.)  This is contrary to all the evidence adduced at trial, and also to the stipulations of the parties, which clearly establish the existence of both contracts.  (*See* Filing No. 393, at 17-18 ¶¶ 28, 29, 32, 33.)  Second, the Court mistakenly instructed the jury that if it found "that CSI was fraudulently persuaded by NNA to enter into either of the contracts, then such contract is not effective and you should assume that it was rescinded."  (Filing

No. 443, at Instruction No. 14.)  In effect, the Court directed the jury to find for the plaintiff and against the defendant on the breach of contract claims if it found for the plaintiff on the promissory fraud claim.  This deprived NNA of its right to a jury determination of its breach of contract claim in circumstances where, as here, the Court disagreed with the advisory verdict regarding the equitable claim.  For both of these reasons, the Court will grant the Nissan Defendants' motion for a new trial with respect to NNA's counterclaim for breach of contract.  A separate order will be entered in accordance with this memorandum opinion.

DATED this 24th day of October, 2008.

BY THE COURT:

/s/ Lyle E. Strom
_____
LYLE E. STROM, Senior Judge
United States District Court